**1218**

**INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS, AFL–CIO, Plaintiff,**

v.

**NATIONAL ELEVATOR INDUSTRY, INC., Defendant.**

No. 83 Civ. 6064 (GLG).

United States District Court, S.D. New York.

Aug. 29, 1984.

Cohen, Weiss & Simon, New York City, and O'Donoghue & O'Donoghue, Washington, D.C., for plaintiff; Robert Matisoff, Washington, D.C., Franklin K. Moss, New York City, of counsel.

Putney, Twombly, Hall & Hirson, New York City, for defendant; Charles O. Strahley, New York City, of counsel.

OPINION

GOETTEL, District Judge.

Before the Court is the defendant's motion to confirm the findings of an arbitrator in a labor dispute and the plaintiff's motion to vacate the arbitrator's findings.[1] For the following reasons, the Court grants the defendant's motion to confirm and denies the plaintiff's motion to vacate.

BACKGROUND

The dispute in this case involves the amount of wages paid to workers who install and maintain elevators. The wages are governed by a collective bargaining agreement between the plaintiff, International Union of Elevator Constructors ("IUEC"), of which the workers are members, and the defendant, National Elevator Industry, Inc. ("NEI"), an organization of employers in the elevator industry.

The current contract became effective on July 9, 1982, and expires on July 8, 1987. This contract uses a formula, developed in

---

**1.** Also before the Court are the defendant's motion for summary judgment, the plaintiff's crossmotion for summary judgment, and the plaintiff's motion to amend its complaint. There is no need to rule on these motions since the Court confirms the arbitrator's findings.

Atlantic City, New Jersey, (the "Atlantic City Plan"), under which wages for employees in the elevator industry are set by averaging the wages of other workers in the principal construction trades.[2]

In the past, the wages of other construction workers have risen steadily, and, as a result, the wages of the IUEC workers have gone up as well. Then, there was trouble in Cedar Rapids, Iowa, home of the IUEC's Local 129. Apparently fearing that high union wage rates would lead more employers in the construction business to employ non-union labor, all of the unions upon whose contracts the Atlantic City Plan is based agreed to accept pay cuts in an attempt to prevent non-union workers from taking jobs then held by union members.[3] The effect of these cuts was that, based on the Atlantic City Plan, the IUEC members were earning $2.54 per hour more than the formula would allow. Following the wage-reducing agreement between the other construction unions and their employers, the NEI unilaterally reduced the wages of IUEC members, in accordance with the Atlantic City Plan.

The IUEC sought a preliminary injunction to bar these decreases, which was denied. The IUEC then instituted this action, seeking a permanent injunction barring the NEI and its member employers from reducing the wages of their employees in Cedar Rapids or in any other location, and for monetary damages suffered as a result of the pay reductions. After the action was filed, the case was moved to the suspense docket pending the outcome of arbitration proceedings before Arbitrator Stephen B. Goldberg ("Goldberg"). The arbitrator has now issued his report, finding that, under the terms of the current agreement between the IUEC and the NEI, the Atlantic City Plan allows the wages of elevator workers to be adjusted downward when the wages of the construction workers to which they are pegged are reduced.

The NEI now moves to confirm those findings and the IUEC moves to vacate them.

DISCUSSION

The IUEC is disturbed by the findings of arbitrator Goldberg, not only because of their impact on the Cedar Rapids workers, but also because of the implications for its members in other locals across the country. The IUEC, in seeking to have the arbitrator's holdings set aside, argues that the wage formula is an "up" escalator only. The NEI argues that, like the elevators they install, the wages of the employees, because they are pegged to the wages of other construction workers, must be allowed to come down as well as go up.

A. The Legal Standard the Court Must Apply in Reviewing the Arbitrator's Findings

■ While the parties disagree as to the propriety of the arbitrator's holdings, they agree on two things: first, that arbitration is critical to the smooth functioning of labor-management relations; and second, that an arbitrator's findings should not be casually set aside by the courts unless the arbitrator has exceeded the scope of the collective bargaining agreement from which he draws his authority.

In *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), Justice Douglas explained that courts should not make haste to re-examine the merits of an arbitration award because "[t]he federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Id.* at 596, 80 S.Ct. at 1360.

2. The formula is set out in Article V of the Standard Agreement between the IUEC and the NEI. Although the formula has undergone some changes over the years, its essential operation is simple: Each local union of the IUEC collects wage and fringe benefit data from the unions of the seven principal construction unions (bricklayers, plasterers, carpenters, electricians, sheet metal workers, plumbers, and steamfitters). The four highest wages are then added together and averaged to arrive at the wages to be paid to IUEC members.

3. Apparently, there is little threat in the elevator industry of non-union labor being used, and so the IUEC is not at all interested in taking a pay cut.

However, Justice Douglas added, this did not mean that courts could never review the merits of an arbitration award.

[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet *his award is legitimate only so long as it draws its essence from the collective bargaining agreement.* When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Id.* at 597, 80 S.Ct. at 1361 (emphasis added). *See Wire Service Guild, Local 222 v. United Press International, Inc.,* 623 F.2d 257 (2d Cir.1980); *Andros Compania Maritima, S.A. v. Marc Rich & Co.,* 579 F.2d 691 (2d Cir.1978); *Local 771, I.A.T.S.E. v. R.K.O. General, Inc.,* 546 F.2d 1107 (2d Cir.1977); *Torrington Co. v. Metal Products Workers Union, Local 1645,* 362 F.2d 677 (2d Cir.1966).

In reviewing the arbitrator's decision, "the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers of America v. Enterprise Wheel & Car Corp., supra,* 363 U.S. at 599, 80 S.Ct. at 1362. "When arbitrators explain their conclusions ... in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result." *Andros Compania Maritima, S.A. v. Marc Rich & Co., supra,* 579 F.2d at 704.

Thus, in considering the motions to confirm or to vacate the findings of the arbitrator, the Court may only decide whether the findings draw their essence from the agreement under which the arbitrator based his authority.

B. *The Arbitrator's Findings Were Faithful to the Essence of the Collective Bargaining Agreement*

■ After reviewing a 196-page transcript and voluminous exhibits, Goldberg handed down a careful, well-reasoned, 33-page decision in which he concluded that the terms of the collective bargaining agreement between the IUEC and the NEI allowed the employers to reduce the wages of elevator workers when the wages of other construction workers went down. Because this decision "draws its essence from the collective bargaining agreement," the Court, as explained above, cannot set it aside. *United Steelworkers of America v. Enterprise Wheel & Car Corp., supra,* 363 U.S. at 597, 80 S.Ct. at 1361.

There is no need to analyze the decision of the arbitrator in detail, but the Court nevertheless briefly notes the following. Although the collective bargaining agreement speaks in terms of wage increases, Goldberg quite properly looked to the history of the agreement and found that the use of the word "increase" was not in any way intended to bar decreases. He appropriately found that there apparently had never been any wage decreases in the construction industry in the past and so the subject of decreases had not been contemplated by either side during the negotiations that led to the signing of the contract. Based on the evidence before him, it cannot be said that Goldberg was incorrect in rejecting the IUEC's claim that some of the changes in the wording of the collective bargaining agreement were intended to eliminate the possibility of wage decreases.

The intent of the parties who developed and agreed to the Atlantic City Plan was to insure that IUEC members would earn wages that were somewhat better than average. By allowing the wages of IUEC members to fall when the wages of the workers to which they were tied also went down, Goldberg interpreted the collective bargaining agreement in a manner consistent with the language, intent, and history of the contract. Because the elevator workers tied their fates to the fates of their fellow construction workers, they must share the ups and downs of the construction industry as a whole.

## CONCLUSION

For the reasons outlined above, the findings of Arbitrator Stephen B. Goldberg are confirmed and the motion of the IUEC to vacate those findings are denied. The defendant will enter judgment accordingly.

SO ORDERED.